UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARMANDO AYALA,

        Petitioner,

                                 CASE NO. 2:06-CV-14113

v.                              JUDGE NANCY G. EDMUNDS
                                 MAGISTRATE JUDGE PAUL J. KOMIVES

MILLICENT WARREN,

        Respondent.

_____/

## REPORT AND RECOMMENDATION

I.    <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus.

II.   <u>REPORT</u>:

A.   *Procedural History*

       1.     Petitioner Armando Ayala is a state prisoner, currently confined at the Thumb Correctional Facility in Lapeer, Michigan.

       2.     On June 24, 2003, petitioner was convicted of two counts of first degree criminal sexual conduct (CSC-I), MICH. COMP. LAWS § 750.520b(1)(a); two counts of second degree criminal sexual conduct (CSC-II), MICH. COMP. LAWS § 750.520c(1)(a); one count of accosting a minor, MICH. COMP. LAWS § 750.145a; and one count of furnishing alcohol to a minor, MICH. COMP. LAWS § 436.17011a, following a jury trial in the Barry County Circuit Court. On July 3, 2003, he was sentenced to concurrent terms of 180-360 months' imprisonment on the CSC-I convictions, 120-180 months' imprisonment on the CSC-II convictions, 153 days' imprisonment on the accosting a minor conviction, and 60 days' imprisonment on the furnishing alcohol conviction.

       3.     Petitioner appealed as of right to the Michigan Court of Appeals raising, through

counsel, a single claim challenging only the CSC-I convictions:

> BECAUSE THE COMPLAINANT'S TESTIMONY THAT MR. AYALA "PUT HIS FINGERS INSIDE FROM MY PRIVATE" WAS INSUFFICIENT TO PROVE THAT CSC I PENETRATION ELEMENT BEYOND A REASONABLE DOUBT, THE TRIAL JUDGE SHOULD HAVE GRANTED THE DEFENSE DIRECTED-VERDICT MOTION, AND THE CSC I CONVICTIONS DEPRIVED MR. AYALA OF HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO DUE PROCESS.

The court of appeals found no merit to petitioner's claim, and affirmed his conviction and sentence. *See People v. Ayala*, No. 249827, 2004 WL 2290472 (Mich. Ct. App. Oct. 12, 2004) (per curiam).

4.     Petitioner sought leave to appeal this issue to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Ayala*, 474 Mich. 853, 702 N.W.2d 577 (2005).

5.     Petitioner, proceeding *pro se*, filed the instant application for the writ of habeas corpus on September 19, 2006. As grounds for the writ, he raises the sufficiency of the evidence claim that he raised in the state courts.

6.     Respondent filed her answer on March 23, 2007. She contends that petitioner's claim is without merit.

7.     Petitioner filed a reply to respondent's answer on April 19, 2007.

B.     *Factual Background Underlying Petitioner's Conviction*

Petitioner's convictions stem from the sexual abuse of his girlfriend's eleven-year-old daughter. The evidence adduced at trial was accurately summarized in petitioner's brief in the Michigan Court of Appeals:

> The six charges related to six separate incidents alleged to have been committed over roughly a six-month span beginning in February 2002. The complaining witness for each charge was LizMarie Ausua, the eleven year old (T 110) daughter of Mr. Ayala's longtime girlfriend. LizMarie Ausua, her brothers Luis

and Adony, her mother Rosa Quinones, and Mr. Ayala had for eight years lived together as a family. T 111-12. During the six-month time period in question, the family had lived in a house in Middleville, Michigan. T 112. At least part of that time Armando Ayala's brother Marcos lived with them, too. T 205.

Sometime in the summer of 2002, LizMarie Ausua ran away from home. T 114. She behind left [sic] a note that read, "Hi Mom. I'm leaving because you and Armando are bad with me. Armando calls me names, I don't want to live with you. If you call the cops, I will talk [sic] the cops the throut [sic]. Please don't look for me. Minnie." T 115; Prosecution Exhibit #3 (admitted in evidence at T 147) (Appendix A). LizMarie testified that she left the note "cause my mom wasn't taking care of me and my brothers right." T 116.

On September 27, 2002, a state trooper came to Armando Ayala's house (T 177) and told him LizMarie Ausua had accused him of sexual contact (T 182). Mr. Ayala denied having physical contact with LizMarie. T 178. He admitted to giving alcohol to LizMarie on occasions. T 178.

The prosecution later brought charges against Armando Ayala and the case went to trial. LizMarie Ausua testified that Armando Ayala had fondled her "top privates"–her breasts–on several occasions (thus making out the elements of CSC II), that he had told her to touch his penis (thus making out the elements of accosting), and that he had more than once forced her to drink alcohol (thus making out the elements of furnishing.) T 122; T 125; T 126-27.

The CSC I charged centered on the prosecution's elements that Armando Ayala had digitally penetrated LizMarie Ausua's vagina. LizMarie testified that the touchings occurred in two locations: her bedroom, and the living-room couch. T 118; T 123.

LizMarie described the bedroom touchings as follows:
"I would–I would probably be sleeping, and then he would just come in, and he–and I wouldn't–I wouldn't feel nothing. And then I would move, and then he would take his hand off really fast.
Q [by the prosecutor]: What part of your body did he touch first?
A:      The bottom.
Q:      And what did he do with his hands on your bottom private?
A:      He would put his fingers inside from my private.
Q:      And how did you know that his fingers were inside of your private?
A:      Because after–if–when I would move, I would–I would feel his hand come–come–come off.
Q:      What you were wearing in the nighttime when you went to bed?
A:      I be [sic] wearing shorts.
Q:      And where did his hands go in relation to your shorts and your underwear?
A:      Inside my shorts." T 121.

She described the living-room touchings as follows:

"Q [by the prosecutor]: And where did he start touching you? What part of your body?
A:      He'll–he'll touch my legs sometimes or he'll just touch my–my bottom private.
Q:      Tell us how he touched your bottom private. What would he do with his hands?
A:      He–he would like sometimes–he'll sometimes rub it or I wouldn't let him. I would just try to push him off. T 123-24.

LizMarie Ausua also testified that Armando Ayala's brother Marcos Ayala had sexual relations with her:

"He [Marcos] would put his private inside.
Q [by the prosecutor]: And where did he put his privates?
A:      Inside my private." T 130-31.

In April 2002, Rosa Quinones had walked into the living room to find Marcos Ayala and her daughter LizMarie on the floor, Marcos on top of Liz Marie. T 197. LizMarie was not wearing pants, and Marcos's pants were down around his knees. T 197-98. Rosa Quinones told Armando Ayala what she had seen, and Armando ordered his brother Marcos from the house. T 198; T 207.

Armando Ayala testified that he first learned of the allegations against him when speaking to a police officer who came to his house in September 2002. T 205. He adamantly denied the allegations of sexual misconduct. T 206. He admitted giving alcohol to LizMarie on one occasion. T 210.

He had a bad relationship with LizMarie. T 211. He was very strict, and she was angry and "bad-spoken." T 212.

In October 2002, he had gone to visit his mother in Mexico. T 208. He had returned to Michigan in January 2003 despite the allegations against him. T 209.

Def.-Appellant's Br. on Appeal, in *People v. Ayala*, No. 249827 (Mich. Ct. App.), at 1-4.[1]

C.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by

the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No.

---

[1]In addition to the testimony summarized in petitioner's state court brief, the prosecution also presented the testimony of Dr. N. Deborah Simms. She testified that the victim's hymen had a cleft or notch, consistent with sexual abuse.

104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).

Amongst other amendments, the AEDPA amended the substantive standards for granting habeas

relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning."

*Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A

state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts

the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are

materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a

result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam)

(quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535

U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court

to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme]

Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*,

539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694.

However, "[i]n order for a federal court to find a state court's application of [Supreme Court]

precedent 'unreasonable,' the state court's decision must have been more than incorrect or

erroneous.  The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court."  Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence."  *Williams*, 529 U.S. at 412.  Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.'  In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16.  Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.    *Analysis*

6

Petitioner raises a single claim in his habeas application, specifically that the victim's ambiguous testimony was not sufficient to establish his guilt of CSC-I beyond a reasonable doubt. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.  *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970).  Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  Reviewing courts must view the evidence, draw inferences, and resolve conflicting inferences from the record in favor of the prosecution.  *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992).  In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993).

However, under the amended version § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision.  Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, *see Jackson*, 443 U.S.

at 324, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

Under Michigan law, criminal sexual conduct in the first degree is defined as follows: "A person is guilty of criminal sexual conduct in the first degree if he or she engages in sexual penetration with another person and if any of the following circumstances exists: (a) That other person is under 13 years of age." MICH. COMP. LAWS § 750.520b(1)(a). Thus, to be convicted of CSC-I the evidence must show that petitioner's victim was under 13 years of age and that he engaged in an act of sexual penetration with her. Further, under the Michigan law, "'[s]exual penetration'" means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body, but emission of semen is not required.' MICH. COMP. LAWS § 750.520a(o).

2. *Analysis*

Petitioner contends that there was insufficient evidence presented to show that his finger penetrated the victim's vagina, as necessary to prove his guilt on the CSC-I charge. Petitioner contends that the victim's testimony regarding penetration was ambiguous, and that her testimony that petitioner "put his fingers inside from my private" is insufficient to show penetration, particularly in light of the fact that the evidence was uncorroborated. The Michigan court of Appeals rejected petitioner's claim, reasoning that the victim essentially testified that "the defendant put his fingers inside her genital opening, and she knew they were inside because she

could feel them." *Ayala*, 2004 WL 2290472, at *1, slip op. at 2.  The court explained that this testimony from the eleven-year-old victim, "although lacking the grace and precision of someone with a more sophisticated command of the language, is sufficiently clear to support the inference that the defendant penetrated her genital opening." *Id*.  The court of appeals also rejected petitioner's argument that, because Dr. Simms could not rule out the possibility that petitioner's brother caused the injury to the victim's hymen, the evidence was insufficient to show that he penetrated the victim. *See id*.  Finally, the court noted that the victim's testimony alone was sufficient to establish guilt, even if not corroborated by other evidence. *See id*. at *2, slip op. at 2. The Court should conclude that this determination was reasonable.

As the court of appeals explained, Michigan law explicitly provides that "[t]he testimony of a victim need not be corroborated in prosecutions under [the criminal sexual conduct statutes]." MICH. COMP. LAWS § 750.520h.  Thus, "[i]t is a well established rule that a jury may convict on the uncorroborated evidence of a CSC victim." *People v. Lemmon*, 456 Mich. 625, 642 n.22, 576 N.W.2d 129, 137 n.22 (1998).  This rule comports with the more general rule in sufficiency of the evidence cases that the testimony of the victim standing alone is sufficient evidence to convict a defendant beyond a reasonable doubt. *See, e.g.*, *United States v. Mejia*, 909 F.2d 242, 245 (7th Cir. 1990); *Holderfield v. Jones*, 903 F. Supp. 1011, 1017 (E.D. La. 1995).  "Even in the face of inconsistent evidence, a victim's testimony alone can be sufficient to support a guilty verdict." *United States v. Kenyon*, 397 F.3d 1071, 1076 (8th Cir. 2005).  Petitioner's argument that the victim's testimony was ambiguous is without merit.  Although the victim lacked the sophistication of an adult, she clearly testified that the defendant "put his fingers inside," and that she could feel it when he removed his fingers.  This testimony was sufficiently clear to allow the jury to conclude

9

that petitioner digitally penetrated the victim and, if accepted by the jury, it was sufficient to find penetration beyond a reasonable doubt.  It is well-established that a reviewing court, whether on direct appeal or habeas review, "do[es] not make credibility determinations in evaluating the sufficiency of the evidence."  *United States v. Owusu*, 199 F.3d 329, 344 (6th Cir. 2000); *Walker v. Russell*, 57 F.2d 472, 475-76 (6th Cir. 1995); *see also*, *United States v. Bailey*, 444 U.S. 394, 414-15 (1980) ("It is for [jurors] and not for appellate courts to say that a particular witness spoke the truth or fabricated a cock-and-bull story.").  "The fact that the testimony is contradictory does not mean that evidence is insufficient, only that the jury must make credibility determinations." *Government of the Virgin Islands v. Isaac*, 50 F.3d 1175, 1179 (3d Cir. 1995).  It is the job of the jury, not this Court sitting on habeas review, to resolve conflicts in the evidence, and this Court must presume that the jury resolved those conflicts in favor of the prosecution.  *See Jackson*, 443 U.S. at 326; *United States v. Sherwood*, 98 F.3d 402, 408 (9th Cir. 1996).  Nor does the fact that Dr. Simms could not definitively rule out penetration by the victim's brother as causing the victim's injuries render the evidence insufficient, as the prosecution is not required to rule out every hypothesis except that of guilt.  *See Jackson*, 443 U.S. at 326.

In short, the victim's testimony, if accepted by the jury, established that petitioner digitally penetrated her as "penetration" is defined by Michigan law, and that testimony alone constitutes sufficient evidence to support petitioner's conviction.  Thus, the Michigan Court of Appeals's rejection of petitioner's claim was not an unreasonable application of clearly established law.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.   *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of

petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.     NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 3/23/09

The undersigned certifies that a copy of the foregoing
order was served on the attorneys of record    by
electronic means or U.S. Mail on March 23, 2009.

s/Eddrey Butts
Case Manager